Good morning, Your Honors. Monica Monge on behalf of the United States. I'd like to reserve two minutes. Your Honors, the issue here is whether the Emergency Exception Doctrine applies in this case. And in the government's opinion, the Emergency Exception Doctrine does apply because there were multiple factors that the officers were required to consider that they did in fact consider on the night they entered the defendant's home. These factors are supposed to be looked at through a totality of the circumstances. Your Honors must look at every single fact in totality and combine them. Your Honors are permitted to cherry pick. And given all the facts, the government believes that an Emergency Exception Doctrine has been met in this particular case. And the government was going to discuss those factors one by one. First, when officers arrived at the scene of the crime, they were aware of two 911 phone calls. The first 911 phone call was made by the victim of the crime. She did not say anything, but the dispatcher heard a large disturbance in the background. The second 911 phone call was made by a neighbor who stated that he could hear two men and a woman fighting in the courtyard, but that it was too dark to be able to see what was going on. So as the officers approached the scene, they were already aware of the fact that this was a domestic violence dispute involving more than just two people. When they arrived at the scene, the two of the officers observed two people exiting the courtyard. They were unable to speak to those people. The record reflects that those people were pretty far out. Officer Cho testified to that in the motion to suppress hearing. When Officer Hodgson yelled for them to turn around and come back, they did not. So the officers were never able to ascertain who those particular two people were. In addition to that, when the officers turned to the defendant who was yelling in the courtyard, they were able to see the defendant who was still inebriated, thrashing around, still fighting, still erupting in violence. So that was their perception of the defendant at the time. When they went to go see the victim, the victim was outside the door, and they were able to look inside the door and see a shattered glass table. The image is actually submitted to your honors on the record. It's GR page 237. And if your honors look at the table, it's completely shattered. It's not just turned over. And the officer testified that when he looked at that table, he believed that there had been violence inside. Now, looking at the totality of the circumstances, why would that give an officer, a reasonably objective officer, reason to believe that there could be other people inside? Well, there are multiple reasons. As previously stated, the officers knew that there were more than two people involved. The 911 phone call had said three. The district court believes that the officers should have put two and two together and, you know, said, oh, well, there are two people exiting, there are two people inside, that's four. But that's still inconsistent with what the 911 call said. The 911 call said that there were three people, not four. The record reflects that it was a very large complex. It was late at night, but the officers did have a reasonably objective basis to believe that there could be other people involved. And that's borne out by the record. In addition to that, when the officers arrived towards the girlfriend, she was exiting the apartment. The calls were made in the courtyard. So that suggested to the officers that the victim had sufficient time to walk back from the courtyard into the home and reemerge. You know, in the government's opinion, that shows that there could be other people that could have emerged or that could have exited the courtyard and emerged from the apartment. Now, the entry of the officers is consistent with their obligation to secure the scene. If your honors were to reverse the facts and think that and look at it to see if, you know, let's assume that they hadn't entered in this particular instance. If there had been other victims bleeding out on the floor of the apartment, if there had been other suspects inside with loaded weapons, the domestic violence victim could have encountered upon reentering the apartment, the officers would have been blamed for that. The officers believe, truly believe that there were people inside and the facts bear that out. The officers would have definitely been criticized for not entering their home, and the case law makes clear that their role is to protect other people. It stems from a community caretaking function. They have a preventative role. Their roles are not simply to make sure that violence doesn't occur, but also to restore order and not simply to render first aid to casualties. So these are all important points. Moreover, with respect to the second prong of the emergency exception doctrine, which asks the court to look at the search's scope and manner were reasonable, well, the evidence shows, the record shows, that the scope and manner were, in fact, reasonable. Officer Valencia entered the home. He testified that he only looked into areas where a person could actually hide. When Officer Kovacs entered the home, he did the same thing. The emergency exception doctrine still applied in Officer Kovacs's instance because when he went into the home and asked Officer Hodgson and Officer Valencia if they had searched the entire home, neither of them were able to establish that they had looked in every single place. So Officer Kovacs, as the head officer that day, wanted to make sure that no victims and no suspects were hiding under a pile of clothes, in a linen closet. Fair enough. I take your point. What then is he doing copying down the serial number of the gun? The case law suggests that if there's anything in plain view when an officer enters the scene under the emergency exception doctrine, that it's permissible to not only look at evidence, but collect that evidence in plain view. And the serial number was in plain view, and Officer Valencia's testimony indicates that. It seems to me you have a pretty good argument that they had the right to make sure that there wasn't anybody else there who could still do violence to the lady in the apartment. But then they won't go beyond that to start copying down serial numbers and looking at other things that were not consistent with trying to find other perpetrators. Your Honor, they did do other things. And Officer Kovacs did testify that his primary concern was to look for victims and suspects, but he was also looking for additional evidence of probable cause. But the case law makes clear, Your Honor, that the subjective intent of the officers has no bearing on whether the emergency exception doctrine is met in this particular instance. Your Honors must look at the facts of the case and determine whether an objectively reasonable person could or would have entered, objectively reasonable officer, rather, would have entered the home. And that's borne out by, in Brigham City, for instance, the accusation of the defendant was that the officers went in there to arrest. And in Fisher, there was a similar accusation, because when the officers went in they didn't call 911 or anyone else for help. And both courts struck down that explanation that it didn't matter, that it was the subjective intent of the officers did not matter. And moreover, anything in plain view is permissible for the officers to confiscate pursuant to the emergency exception doctrine. Yeah, I don't know anything about the officers' vision. And I haven't seen the gun, so I can't tell you the size. But does it take more than a pass-through to record the serial number on the gun that's laying on the table? Your Honor, the officer of Valencia, when he entered the home, was able to see the serial number of the gun immediately. And there's actually a photograph, a colored photograph, in the excerpts of records showing how the gun was placed. And he ran the serial numbers, and it came back as stolen. I do not believe that the records suggest that Officer Kovach's primary intent was to go in. Again, his subjective intent doesn't really matter for purposes of determining whether there was an emergency in this particular instance. But to the extent that Officer Kovach rechecked the serial numbers, it was mostly because he considered himself in charge of the scene, and he just wanted to verify that there was a basis to arrest the defendant based on the fact that he was a felon in possession of a gun. But in any event, Your Honor, the emergency exception, the governance positions of the emergency exception doctrine would still apply even when Officer Kovach was coming in because the emergency hadn't been anticipated precisely because when the two officers, one of them being a trainee, went in the first time, they weren't able to tell Officer Kovach that they had searched every single location for a victim or suspect. And Officer Kovach, in his testimony at the Motion to Suppress hearing, is very clear about the fact that that was of concern for him. The information was unclear. This was a case akin to Russell, where there were those two 911 calls and the information was unclear. The Ninth Circuit has made clear, this Circuit has made clear, that the most plausible explanation isn't the explanation that officers have to go by. If an objectively reasonable officer has a basis to believe that there is any reason why there could be a victim or suspect or anyone in the home that could cause danger to either the people outside or to the people inside, that they are permitted to enter. And the Circuit is not required or allowed to second-guess the decisions of the reasonable basis to enter in the first place. Let me ask you this. Say an officer enters under the emergency exception and validly, we're talking hypothetically, walks in and there is a, say, a kilo of cocaine sitting on the kitchen table. Does he have to ignore that or can he take that into possession after he's seen it in plain sight during a valid emergency entry? Your Honor, my understanding of the case law is that he may, he may confiscate that if that's in plain sight. That cannot be the, it can't be, that can't be the purpose of his entry. If his entry is permitted. I know that. I've assumed the purpose of his entry is the emergency exception to the rule, and I'm asking why wouldn't that be the same thing as seeing a loaded firearm and looking at the serial number? The, it probably, it probably is akin to that. But I guess the government's point is that that's not impermissible, given the fact that it was, the serial number itself was also in plain view just like Your Honor's example of the cocaine would be in plain view as well. Would it make any difference if one is contraband and one is not? Your Honor, I believe that in this particular instance where there was a domestic violence dispute, where there was the possibility that the gun could be used subsequent to that, that it was wise of the officers to make sure that that gun was even a firearm and even if, I guess, for instance, if he had run the serial number and it came back legal, the officers probably would have had no reason to confiscate it. I mean, the reason it was confiscated at that particular time is because it was analogous to the sack of cocaine in the sense that after the serial number was run, after they determined that the defendant was a felon, that was evidence of a crime. But they would have certainly had the right to pick it up and disarm it to unload it. Under the public safety exception, Your Honor, they would have had that right. Does the government admit that if there is no emergency exception here, that everything falls? Yes, Your Honor, the government will admit to that. Everything else would be the fruit of the illegal search. Correct, Your Honor, but the government's position is that both searches are valid and as a result, the plain view doctrine would apply for the car and the statements would be as with the items that were retrieved from the search warrant. So all of them would be relevant. If Your Honors don't have any additional questions for the government, the government would still like to reserve time. Thank you. Good morning. Good morning. May it please the Court, Jonathan Libby appearing on behalf of Corey Brown. Your Honors, Judge Morrow's detailed and well-reasoned decision granting the motion to suppress in this case should be affirmed. The government has failed to meet its heavy burden of demonstrating that the emergency aid exception to the Fourth Amendment warrant requirement permitted the warrantless entry into Mr. Brown's home. And the government seems to forget in this entire analysis, in this entire discussion, this was Mr. Brown's home, and it's presumptively unreasonable to enter the home. The government seems to be suggesting, well, this is a domestic violence call, and so that somehow reverses the presumption that somehow because we have this call and, well, we're not sure what might be going on, we can simply enter someone's home to check, to make sure. That's not the law. The Fourth Amendment is very clear. You can't enter without a warrant, absent going in, in this case, to actually give aid to someone you reasonably suspect is in there and injured. The facts just don't support that here. What Judge Morrow found was there were at most four individuals potentially involved in this domestic dispute, and that four individuals had been discovered by the police officers. You know the difficulty, at least from one perspective. How do we know these two people who were seen exiting, there's no doubt two people seen came from that apartment, on this record? Well, I would submit given the time of the night, given the facts that were Of course, the time of the morning. The time of the morning, certainly. I mean, it was very early in the morning, right. Given the time, given what we knew, that there were potentially these four people Two were leaving. All I'm asking you is, is it a stretch to say that those two people came from that apartment on this record? Your Honor, is it a stretch? I think it's a major stretch. You know, perhaps it's a I want to tell you that so you can tell me why it's not. Well, Your Honor, if it is a stretch, I don't believe it is such a stretch that it would be a clearly erroneous factual finding by the district court. I think the district court looked at the record, heard the officer's testimony. She made a determination based on the record and testimony. The district court didn't have a basis for making the finding a fact of where these two people came from, because nobody said where they came from in the testimony, and the two people refused to turn around when the police wanted to question them. So, on this record, and that's what we have to decide this case on, don't we? Absolutely, Your Honor. I would simply submit that, given the time of the morning, given what the officers knew, what we know from the 911 calls, given the location, the size of the apartment complex. The 911 call was confusing, don't you think, on this record? It was somewhat confusing. I mean, we have two 911 calls, one from the purported victim, and then one that's somewhat ambiguous from a neighbor, certainly. Right, well, that's what we know. And they weren't consistent. That's correct. That's correct, which is why the court found there were at most four individuals involved. There were probably no more, well, based on the calls, there were maybe only three individuals involved. We happen to know that there were four. Now, you tell me whether I'm wrong or not. I think this record requires somebody to do a lot of speculating in order to get to the point you make. Well, perhaps, but then the question becomes. No, you can tell me that it doesn't. Well, no, I mean, obviously all of this becomes some type of speculation. I mean, that's what the officers are dealing with as well. Yeah, but it's a critical call, don't you think? Well, but the question then, of course, becomes. We ought to be as right as we can be, and the way we can be as right as we can be is to get a clear picture of what the officers knew or had reason to believe at the time, don't we? Absolutely. So they saw two people, no doubt about that. But I don't see how we can say they knew or had reason to believe that those people had to be coming from the apartment in question. And isn't that critical to your analysis? I don't believe it's critical to the analysis, Your Honor, even if we discount those two individuals. And then what do we know? What did the officers then know? Well, they knew that we had Crystal. They knew that they had somebody in distress, somebody who thought she was in distress. They knew that they had found the individual who had placed one of the 911 calls. How did they know that? Because they spoke with her, and she identified herself as Crystal, which was the name given on the 911 call. And she confirmed that she had made the 911 call. So they knew that they had the purported victim of this domestic dispute. Okay? And they knew that. And they asked, and she said, nobody's in the apartment, I think. Isn't that collection correct? That's correct. But did they have to believe it? What, did they have to believe it? Well, I think it was entirely inappropriate for the officer to simply discount her statement. I mean, what the officer said was, well, we know that domestic violence victims often lie to protect their attackers. Okay, so does that mean that if there's a domestic violence call, officers can simply then go into a home when the purported victim says no one's in there because, well, domestic violence victims lie. So if that's the case, then aren't we then creating a domestic violence exception to the Fourth Amendment? And, of course, the answer to this court is said time and time again. Well, I don't think anybody's going to do it today, I don't think. But I'm wondering if we get to that. Well, what the officers knew was the purported victim was, she was outside the home at the time. She did appear upset, but did not appear to have any physical injuries on her. They knew that the boyfriend had already been detained. He was in handcuffs in the courtyard, so he was not in the home. And that's two people accounted for. That's correct. And there was nothing else coming from the home. They did not hear any voices. They did not see anyone. In order to get to where you want us to go, though, we have to know that those two people who the police officers saw left that apartment, or we have to say on this record it's reasonable to conclude that they left that apartment. You're referring to the other two? No, I mean, I... Because there were more than two people so far as the 911 calls were concerned. I'm not suggesting there were more than two. But on the 911, that's what the officers... Well, suggested that there were perhaps other people involved. But understand, what that 911 call said was there were individuals in the courtyard that were fighting, not individuals in the house. The only people we had any phone call from involving a potential domestic violence in the house was from Crystal, who at that point was outside the house. The purported perpetrator was outside the house. She said no one else was inside the house. And the officers didn't hear anybody else inside the house. They saw this overturned table, which certainly suggests there may have been a fight at some point prior to that. But, you know... You don't have to make it an overturned table. It was more than an overturned table. And it doesn't matter, I don't think. It doesn't matter. Well, I don't think it matters. I mean, an overturned table... You make me think that you think it does matter. No, no, no. Because you're making a smashed table an overturned table. No, that's the only fact. That's the only additional fact the officers had, and I'm suggesting that in and of itself would not be enough to say, well, there are people inside that apartment who may be injured and in need of immediate assistance. The fact is, there was no basis for that. And when you look at this Court's case law, when you look at the Supreme Court's case law on the emergency doctrine, no case has upheld under the emergency doctrine a search with this little amount of facts to justify the search. They're just not there. I mean, when you look at the most recent Supreme Court decision in Fisher, you know, which, of course, they were overturning a State court which, in fact, said there wasn't enough facts. They said there, well, we're going to find there was enough facts, because when police get there, they find a household in considerable chaos. They find a pickup truck that's smashed. They find blood on the pickup truck, bloody clothes in the pickup truck, fence posts that are knocked down. And still, the Court found it was kind of a close case. You know, here, we don't have anything like that to suggest there was any injuries. And then, of course, police then see through a window someone actually kind of going crazy, throwing things. We don't have any of that here. And when you're dealing with the emergency doctrine, you're dealing with whether there – and this is what the Supreme Court said in Fisher – whether there was an objectively reasonable basis for believing that medical assistance was needed or persons were in danger. How would you state the narrow question that is before us today? How would you state the issue? Well, I'd simply state it as whether the district court's decision should be affirmed and leave it at that. I mean, that would be the simplest thing. There were some questions with respect to the scope of the search earlier. In order to decide whether to affirm, we've got to make some conclusions based on this record, don't you think? Well, I think you can adopt the district court's factual findings and legal conclusions, which were entirely reasonable on this record. I mean, there's nothing wrong with what the district court found here. That, you know, simply there was nothing that these officers knew at the time to justify an entry into the home, unless you're going to essentially establish a domestic violence exception to the Fourth Amendment. Well, we know there's no domestic violence exception, but why shouldn't the rule in this case be, when the police have reason to believe that there might be another assailant in the apartment, they have the right to go in the house and make sure that the victim who called the police isn't being placed under duress at the door when she says no one's there? Well, I guess the question then becomes, was, in fact, there reasonable belief that there were other assailants in the apartment? Okay, well, there you go again with our phone calls. We get a phone call from a neighbor who says there are two men and one woman. In the courtyard, not in the apartments. And the door is open, and when they get there, there's one woman and one man in the courtyard. They look through the open door and see the evidence of some sort of violence or fight. I mean, what else would they think but that there might be another person, the other man in the house? Well, look, Your Honor, the fact is, in any situation, there is always a possibility that when police get to a residence, regardless of the situation, I'm talking about when the facts say no, is that there were two men and one woman fighting in the courtyard. They come to the courtyard. There's one man and one woman in the courtyard. The door to the house is open. There's evidence of violence or a fight in the house, and there's not one that other man has not accounted for. Well, with respect to that, the woman was not, in fact, in the courtyard. Crystal, in fact, was seen coming out of the apartment, and then they spoke with her right in front of the apartment. I don't think that changes the hypothetical. She was in the house, which would make me think it's even more reasonable to think the other man involved in the fight may have been in the house. Well, again, she said that there wasn't anybody else there. The police didn't hear anybody else there. There was no indication to the police that they saw that anyone had been injured, including the purported victim of this domestic dispute, who they identified at that point as the purported victim. So I guess who is this possible person? I mean, is it possible there's a person in there? Yes, there's always a possibility at any time that there's going to be someone else in the home, but police didn't hear. You know, we can't ignore the facts, and that's what the judge was asking about. They had indicated two men and one woman, and he's spelled it out about as clearly as he can. How would the police know that that third person wasn't in the house? They wouldn't necessarily know, but I guess my response to that is, so what? You know, there's always a possibility there are other people that are going to be in the house when police get to a house, but so what? What did the police know at the time to suggest that someone in the house was in need of immediate emergency assistance? Nothing. Nothing. Breyer. Except the destroyed coffee table. No. There was a broken coffee table. What does that – how does that suggest necessarily that someone was injured and in need of immediate assistance? I mean, it doesn't. I mean, I think it makes a – it has to take a very big leap to kind of assume that because there's a broken coffee table that someone is necessarily injured. The danger always with these kinds of cases is that we can't go back to the moment, so we have to now look at it. Knowing the facts as we know them, what would a reasonable police officer have to assume based on what we know are the facts? Absolutely. But that also, of course, must be balanced against an individual's Fourth Amendment right not to have the sanctity of his home invaded. And I would submit, based on this record, the government simply has not met that heavy burden justifying that wantless entry into Mr. Brown's home. And I say I have 10 seconds, so unless the Court has any additional questions, I'll submit. Thank you. I think your client would be happy that he's been well represented. Thank you. Thank you, Your Honors. The government just would like to make a couple quick points. There has to be some speculation on the part of the police officers what he wants to suggest to us. There had to be. And was it reasonable speculation? There had to be some – sorry, there did have to be some speculation, but the case law makes very clear, Your Honor, that the officers are not required to have 100 percent certainty before they go into a home. If there's enough facts there that an objectively reasonable officer would feel uncomfortable walking away from the scene believing that there were other people inside the home, that satisfies the objective reasonability test that was articulated by this Court this night. His point is who could have been in the home, though, when two people had been seen exiting, plus the victim, plus the perpetrator. Your Honor, I think the – Who could have been seen, so, from his perspective. The point made by the panel, however, is that still didn't add up. It still didn't add up, as one of the questions seemed to indicate. The call itself said two men, one woman. The two people that walked away, it was a man and a woman. They saw another man and a woman outside. That's four people versus three. And the order states that the officers should have known because they should have known that there were at most four individuals. Well, at most is still an unclear number. There was conflicting evidence, and the government would argue that this is very akin to the case of Russell, where there were two 911 calls. One of the 911 calls was made by a person by the name of Gregory Hines, who said he was shot in the foot. A second 911 call was then made by the defendant, Russell, who also said he was shot in the foot. And they could hear two women – the dispatch could hear two women in the background. When the officers got to the scene of the crime, they saw the defendant outside with the shot foot and the two women. And, you know, one of the most plausible explanations would have been that both of the calls were made by the same person because the calls were similar. But the Ninth Circuit – this court allowed the officers to go in because they believed the officers had an objectively reasonable basis, given the conflicting information. And this case is no different. There was conflicting information regarding the number of people. The defense sort of downplays the fact that the girlfriend was walking out of the apartment when we know that the 911 calls were made in the courtyard, suggesting that there was sufficient time for whoever was involved in the dispute to get back into the apartment and walk out. And Officer Cho saw that shattered glass table, which to him indicated that one or more people were involved in some sort of recent altercation inside. And with that, the government submits – with one brief additional issue. The government's argument is that this is a mixed question of law and fact. The government's not contesting the factual findings made by the district court. And the standard of review to apply here is de novo. And if there are any additional questions, otherwise, the government submits. Thank you. Thank you. Thank you. Thank you, Officer. The case is started. It will stand in recess for today. Thank you. It stands adjourned.
judges: Camp, Farris, Silverman